IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

BRIAN R. McDOWELL,

                    Plaintiff,

        v.

USAA GENERAL INDEMNITY
COMPANY,

                    Defendant.

HONORABLE JEROME B. SIMANDLE

Civil Action No.
14-4529 (JBS/KMW)

**OPINION**

APPEARANCES:

Judith L. Rosenthal, Esq.
12 Marion Avenue
Short Hills, NJ 07078
        Attorney for Plaintiff

Georgette Castner, Esq.
Ethan A. Hougah, Esq.
MONTGOMERY MCCRACKEN WALKER & RHOADS LLP
Libertyview Building
457 Haddonfield Road
Suite 600
Cherry Hill, NJ 08002
        Attorneys for Defendant

**SIMANDLE, District Judge:**

## I.   INTRODUCTION

In this National Flood Insurance Program ("NFIP") coverage action, Plaintiff Brian R. McDowell (hereinafter, "Plaintiff") seeks damages against Defendant USAA General Indemnity Company (hereinafter, "USAA" or "Defendant") arising from Defendant adjustment of Plaintiff's claim for property damage to his home caused by Superstorm Sandy. Before the Court is Defendant's

motion for summary judgment, as well as Plaintiff's cross-motion for partial summary judgment on Plaintiff's Internal Cost of Compliance ("ICC") claim. [Docket Items 85 and 94.] The principal issue to be decided is whether Plaintiff complied with the conditions and requirements under his Standard Flood Insurance Policy ("SFIP"). For the reasons that follow, Defendant's motion for summary judgment will be granted and Plaintiff's cross-motion for partial summary judgment will be denied.

## II. BACKGROUND[1]

### A. Factual Background[2]

In 2005, Defendant issued an SFIP and a homeowners' policy to Plaintiff for his one-story, single-family home located in Forked River, New Jersey (Def. Statement of Undisputed Material Facts ("SUMF") at ¶¶ 1-2.) Plaintiff is a First Class Petty

---

[1] The Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 4072. Federal law including the National Flood Insurance Program regulations provide the rules of decision.

[2] The Court distills this undisputed version of events from the parties' statements of material facts, affidavits, and exhibits, and recounts them in the manner most favorable to Plaintiff, as the party opposing summary judgment. The Court disregards, as it must, those portions of the parties' statements of material facts that lack citation to relevant record evidence (unless admitted by the opponent), contain improper legal argument or conclusions, or recite factual irrelevancies. See generally L. Civ. R. 56.1(a); see also Kemly v. Werner Co., 151 F. Supp. 3d. 496, 499 n. 2 (D.N.J. 2015) (disregarding portions of the parties' statements of material facts on these grounds); Jones v. Sanko Steamship Co., Ltd., 148 F. Supp. 3d 374, 379 n. 9 (D.N.J. 2015) (same).

Officer Builder, Rank E6, with the United States Navy and his responsibilities consist of a "complete knowledge of every aspect of building between concrete, framing, drywall, sheathing, framing, all aspects of building." (Pl. Counterstatement of Material Facts "CSMF" at ¶ 8.)

### 1. Pre-Sandy claims

In November 2010, Plaintiff made a claim under his Homeowner's Policy for flooding that was allegedly caused by a rechargeable battery catching fire and damaging a pipe in his house; this damage required certain repairs. (Def. SUMF at ¶¶ 4-5.) Plaintiff's net claim was $48,050 with $15,623.60 in recoverable depreciation. (Id. at ¶ 7.) Defendant covered the fire loss under Plaintiff's Homeowner's Policy, not the SFIP Policy, and paid Plaintiff $31,926.40 in connection with the loss. (Pl. CSMF at ¶¶ 30, 34.) Plaintiff testified that immediately following the fire, he "fixed the electrical, the boiler, the ceiling tile" and cleaned. (Pl. CSMF at ¶ 35.)

Plaintiff made a claim under his SFIP in July 2011 for water damage allegedly caused by rainwater infiltration. (Def. SMF at ¶ 11.) By letter dated February 20, 2013, Defendant notified Plaintiff that "there was no demonstrable damage to [his] dwelling from the . . . flooding event . . . we are closing our file without payment or further activity." (Plaintiff's Response to Def. SMF at ¶ 13.) Further, Defendant

3

stated that the basis of denial was that the water was due to "storm drains overflowing." (Pl. CSMF at ¶ 58.) On August 14, 2011, Plaintiff experienced flooding at his home. (Id. at ¶ 14; Pl. CSMF at ¶ 60.) Plaintiff did not make a claim for any loss, and Defendant did not inspect Plaintiff's home in connection with this event. (Pl. CSMF at ¶¶ 61-62.)

Then, on August 28, 2011, Plaintiff experienced a loss to his home due to Hurricane Irene; specifically, approximately 12 inches of the right wall of the home bowed out due to the entry of water into the home. (Id. at ¶ 65.) Plaintiff submitted a claim for damages in connection with this loss, and on September 13, 2011, an adjuster for Defendant inspected Plaintiff's home. (Def. SMF at ¶ 15; Pl. CSMF at ¶ 67.) On his Preliminary Report, the adjuster checked "No" in response to the form question, "Was there a general and temporary condition of flooding[?]" (Pl. CSMF at ¶ 69.) In late October/early November 2011, Plaintiff's friend Michael Carey helped him repair the drywall. (Id. at ¶¶ 44-47, 112-113.) Another friend, Kenneth Bradley, helped Plaintiff with electrical work. (Pl. CSMF at ¶¶ 124-25.) However, Plaintiff did not take any photographs of the repair work, nor did he take any photographs inside his home following the completion of the repairs. (Def. SMF at ¶ 48.) With respect to the displaced right wall, Plaintiff stated that he "jacked it up . . . and pushed it back in [onto the

foundation]." (Id. at ¶ 50.)  Plaintiff did not install any

anchor bolts to secure the wall to the slab. (Id. at ¶ 51.)

Plaintiff testified that he made a variety of repairs following

Hurricane Irene. (Pl. CSMF at ¶ 38.)

Defendant commissioned Atlantic Professional Services, Inc.

("Atlantic") to determine the cause of the 2011 Irene loss. (Id.

at ¶ 70.)  On October 26, 2011, Atlantic inspected Plaintiff's

home. (Def. SMF at ¶¶ 16-17.)  Atlantic then issued a report on

November 3, 2011, where it concluded that the "right wall

displaced outward as a result of inadequate anchoring (lack of

anchoring) of the base plate to the slab. The base plate and the

base of the sheathing were replaced approximately 12 years ago

prior to the installation of the vinyl siding due to rot." (Id.

at ¶¶ 19-20.)  Atlantic further concluded that the "structure is

located below elevation of the street and there are no

provisions of drainage away from the structure." (Id. at ¶ 21.)

Atlantic recommended in the report that the right wall be pushed

back into position and anchored, and that the property be

properly graded. (Id. at ¶ 22.) Defendant later admitted that

the Atlantic report "is not a repair report." (Pl. CSMF at ¶¶

72, 75.)  In addition, Plaintiff testified that he never

received the 2011 Atlantic Report. (Id. at ¶ 83.)

On February 13, 2012, Defendant denied Plaintiff's

Hurricane Irene claim, stating that "there is no evidence of a

general condition of flooding as described in Section II-
Definition, 'Flood,' of the flood insurance policy." (Def. SMF
at ¶ 23; Pl. CSMF at ¶¶ 23, 93.)  Defendant also advised
Plaintiff of his right to file an appeal, but Plaintiff did not
do so. (Def. SMF at ¶ 24.)

### 2. Superstorm Sandy claim

On October 29, 2012, Plaintiff's home experienced a loss
due to the infiltration of several feet of flood waters as a
result of Superstorm Sandy; Plaintiff immediately notified
Defendant of the flood loss claim on November 2, 2012. (Id. at
¶¶ 25-26; Pl. CSMF at ¶¶ 95-96, 109.)[3]  Plaintiff told Defendant
that he had just been allowed back into his home and that he had
22-23 inches of water in the entire home. (Def. SMF at ¶ 27.)
He further informed Defendant that he had extensive damage to
the walls, floors, doors and exterior of the home in addition to
his personal property. (Id. at ¶ 28.)  Plaintiff removed all of
his furniture and tore down all of the sheetrock and insulation,
while also removing all of his appliances (dishwasher, stove,
refrigerator, washer and dryer), which were taken from the side
of his home. (Id. at ¶¶ 52-53.)

---

[3] For the policy period beginning April 21, 2012 and ending April
21, 2013, Defendant issued SFIP Policy No. 167488920F to
Plaintiff. (Def. SMF at ¶ 3.)  The SFIP provided $250,000 in
Coverage A-Building Coverage with a $1,000 deductible and did
not provide for any Coverage B-Contents Coverage. (Id.)

Soon after notification, Defendant began adjusting the claim and assigned the claim to Allcat Claims, an independent claims adjusting firm. (Id. at ¶ 29.) On November 8, 2012, Plaintiff was advised to mitigate damages as needed as required by the SFIP, and in response Plaintiff advised that he "gutted" the house to prevent further damage from happening as the insulation was soaking up the water into the walls. (Pl. CSMF at ¶¶ 111-12.) On either November 9 or 10, 2012, Chris Herrera of Allcat Claims inspected Plaintiff's home and took preliminary photos; but on November 12, 2012, the claim was reassigned to Richard Carlson, an adjuster with Defendant,[4] and Mr. Carlson inspected the property on November 15, 2012. (Def. SMF at ¶¶ 30, 32-33.) During the inspection, Mr. Carlson noted the following:

> [H]ouse is gutted with all drywall out of house except the master closet. Kitchen cabinets and appliances gone. ¾ bath is not gutted. Interior doors gone. Member claims he gutted house himself after flood and piled debris by street and city picked it all up. He claims that someone broke into house and took baseboard heaters and copper piping and wiring. Asked him if he had any photos of the damage prior to the demo and he had a few on his phone but I couldn't tell if there was drywall up. He will email them to me. Advised him I would have to review prior claim files and look at the photos. He understands.

---

[4] On November 12, 2012, the same day that Defendant reassigned the file from Allcat to Carlson, a representative from Allcat sent a note to Defendant stating "[p]roperty appears to be substantially damaged . . . [Plaintiff] has two walls that have shifted off of the foundation and a support for the ridge beam that is broken as well. The house may need to come down b/c of the structural damage. (Pl. Resp. at ¶ 107.) The severity code was also upgraded from a "Severity Code 4-Heavy" to "Severity Code 5 – Major." (Id. at ¶ 108.)

(Id. at ¶ 34.) The next day, Mr. Carlson checked the prior loss photos, and concluded that the "house is in the same condition now as it was [in 2011]. Drywall was gutted and photos appear to match what is there now." (Id. at ¶ 35.) The following day, Mr. Carlson informed Plaintiff of his conclusion, and Plaintiff replied that "the repairs were done and the house had been repaired prior to this flood." (Id. at ¶ 36.) On November 19, 2012, Mr. Carlson advised Plaintiff that he had prepared an estimate of the damage due to Superstorm Sandy in the amount of approximately $16,000. (Id. at ¶ 38.)

On November 24, 2012, Defendant received a letter of representation from Asset Protection Public Adjustment for Plaintiff's flood claim, and Defendant informed Asset Protection that they needed a statement from Plaintiff to understand what is being claimed, the prior damages and repairs that were made as well as to inspect and verify the photographs submitted by Plaintiff. (Id. at ¶¶ 42-43.) On December 7, 2012, Plaintiff's neighbor, Chris Haier, stated that he had seen Plaintiff gutting the residence following the Hurricane and pointed to several tubs and other household items strewn about the front of the property. (Pl. CSMF at ¶ 120(a).) On December 19, 2012, Defendant requested documentation from Asset Protection regarding the repairs that were made by Plaintiff. (Id. at ¶ 54.)

Then, On January 2, 2013, Plaintiff was paid $15,212.99 by Defendant for those damages that were directly caused by Sandy. (Id. at ¶ 56.) On January 18, 2013, Asset Protection provided Defendant with an affidavit from Plaintiff's friend Mr. Carey, stating that Mr. Carey assisted Plaintiff in re-hanging drywall in the living room and master bedroom following Hurricane Irene. (Id. at ¶ 60.) On February 19, 2013, Asset Protection provided an estimate to Defendant of $259,113.97 to demolish and rebuilt the Plaintiff's home. (Id. at ¶ 69.) On March 25, 2013, Asset Protection hired a structural engineer (Careaga Engineering, Inc.) to report the damage caused by Sandy, and Careaga inspected Plaintiff's home on March 29, 2013. (Id. at ¶¶ 74-75.) Careaga concluded that "standing floodwaters remained in the house after the floodwaters on the property receded . . . [and] exerted an outwards hydrostatic pressure on the exterior walls . . . [that] pushed the rear wall of the house and caused it to be become displaced off the slab foundation . . . The remaining walls were not displaced." (Id. at ¶ 76.) Careaga concluded that the displacement of the rear exterior wall caused the structural damage inside the home, including the roof ridge to shift, the loose connections between the roof rafters and the ridge beam, gaps between the wood members and the buckling of the load bearing wall. (Id. at ¶ 78.)

On June 14, 2013, Defendant advised Asset Protection that based on the claims history, Plaintiff's home remained substantially unchanged since the 2010 fire, and that while the home did sustain flood damage as a result of Sandy, the extent of the damage had to be determined. (Id. at ¶¶ 81-82.) Defendant further advised that an inspection had been done in 2011 that confirmed structural issues with the home that were not the result of the 2011 flood; as a result, Defendant advised that an inspection by an engineer would be required. (Id. at ¶ 83.)

On July 1, 2013, Defendant's engineer, Atlantic, prepared a report, and concluded that "the structure has not been repaired since the fire of 2010 and since the Atlantic inspection of October 26, 2011. Most importantly the base of the walls has not been anchored as recommended in the November 3, 2011 Atlantic report." (Id. at ¶ 86.) Atlantic therefore determined that the "structure was in major need of repair well before [Sandy] and the additional damages are strictly the result of failure to perform repairs." (Id.) On July 18, 2013, Defendant issued a partial denial of Plaintiff's claim based on the policy provision that states that "[w]e are not liable for loss that occurs while there is a hazard that is increased by any means within your control or knowledge." (Id. at ¶ 87.) Defendant further stated that Plaintiff's home "has not been repaired

since the fire of 2010 and since the Atlantic inspection of
October 26, 2011." (Pl. CSMF at ¶ 168.)

Then, on August 27, 2013, Keith Shackelford from the NFIP
conducted an inspection of Plaintiff's home, and on September 6,
2013, FEMA issued a report in which it agreed with Atlantic's
July 1, 2013 findings that the right wall had displaced prior to
Sandy. (Id. at ¶¶ 89-90.) FEMA recommended that Atlantic
provide an addendum to the July 1st report outlining the
percentage of damage to the rear wall that can be contributed to
Sandy, and a method of repair. (Id. at ¶ 91.)

On September 30, 2013, Defendant notified Plaintiff of his
duties under the policy with respect to Article VII(J)(4) and
(9) of the SFIP, as well as the new deadline of April 28, 2014
to submit a Proof of Loss (hereinafter, "POL"). (Id. at ¶ 93.)
On October 1, 2013, Atlantic issued an addendum to its report,
and determined that if repairs to secure the exterior walls had
been made prior to Sandy, "then the additional outward movement
would not have occurred." (Id. at ¶ 95.) Atlantic concluded
that "there is no additional damage that would have created any
additional repair methods or costs than what would have been
required prior to SS Sandy as hereinbefore outlined even though
the rear wall has displaced slightly more than after SS [S]andy
as hereinbefore discussed, keeping in mind that this additional
displacement was the direct result of flood waters and lack of

attachment of the walls to the slab and lack to perform the recommended repairs after the October 26, 2011 Atlantic inspection." (Id. at ¶ 97.)

On October 9, 2013, Defendant advised Plaintiff that the flood policy would cover the cost to reset the rear wall and anchor it in the same fashion that it was at the time of loss. (Id. at ¶ 98.) Defendant advised that a revised estimate would be prepared to see if an agreement could be reached regarding the scope and cost of making the repairs. (Id. at ¶ 99.) On November 14, 2013, Allcat Claims issued a revised repair estimate for $25,238.48 and calculated the cost to rebuild the home as $90,480.42. (Id. at ¶ 100.)

Furthermore, on November 15, 2013, a Construction Official of Lacey Township issued a "Substantial Damage" letter advising that the Plaintiff's home had "sustained damage over 50% of the market value of $68,100" and thus fell within FEMA guidelines for substantial damage." (Pl. CSMF at ¶ 105.) The representative further stated that Plaintiff's home would "have to be raised to new advisory flood elevation or demolished" and rebuilt to the new elevation. (Id.)

On November 23, 2013, Plaintiff submitted a signed POL for $20,271.74 to Defendant as to the undisputed loss, and based on

Allcat Claims, Plaintiff was paid $10,025.89 on December 10, 2013. (Def. SMF at ¶¶ 101-02.)[5]

Then, on March 6, 2014, Asset Protection submitted a POL on behalf of Plaintiff seeking $250,000 in damages; the POL was not signed by Plaintiff and there were no estimates attached. (Id. at ¶ 103.) On April 14, 2014, Plaintiff submitted another POL to Defendant for $250,000; the estimates attached to the POL were estimates to completely tear down and rebuilt the house as if it was a total loss. (Id. at ¶¶ 104-05, 118.) Defendant rejected Plaintiff's April 14, 2014 POL because the values were allegedly not substantiated and/or agreed to, the scope of damage was beyond direct physical loss caused by or from flood and the values included code compliance, which is not covered under the policy. (Id. at ¶ 106.) Defendant's corporate designee stated that Plaintiff's April 13, 2014 POL was deficient because the attached estimates were for a rebuild, and

_____

[5] While litigation was pending, on March 20, 2013, Plaintiff applied for a grant through the New Jersey Department of Community Affairs, Sandy Recovery Division ("DCA")(Pl. CSMF at ¶ 156.) On December 21, 2013, after an inspection, a representative from the New Jersey Reconstruction, Rehabilitation, Elevation and Mitigation (RREM) Program found that Plaintiff's home sustained "[s]tructural deterioration beyond repair . . . Extensive damage to roofing, floor, sub-floor, or electrical/plumbing systems." (Id. at ¶ 103.) DCA calculated the cost to rebuild Plaintiff's home as $199,925.00 which, when completed repairs ($950 for an engineering report) and when construction contingency was added in ($30,131.25), totaled $231,006.25. (Id. at ¶ 159.)

not to repair flood damage. (Id. at ¶¶ 126-27.) The designee
explained that "this is not a total loss, this is a repairable
home as a result of Superstorm Sandy," and that Plaintiff's
policy "only pays for direct physical loss by flood . . . [i]t
does not pay for code compliance, except for the $30,000 for
[Increased Cost of Compliance] . . . this isn't a valued
policy[.]" (Id. at ¶¶ 128-29.) The designee also testified how
Defendant determined the estimated replacement cost value
("RCV") of $90,480.42 for the home, and that the RCV is based on
the condition of the home at the time of Sandy, not as a result
of damages from Sandy, so the adjuster would have evaluated the
home . . . It's based on what is inside the home or how the home
is finished[.]" (Id. at ¶¶ 130-31.)

    Then, on April 28, 2014, Defendant issued a denial letter
on three bases: (1) the values in the POL were allegedly not
substantiated or agreed to; (2) the scope of damage was not
direct physical loss due to Sandy; and (3) the estimates
allegedly included code compliance. (Pl. CMF at ¶ 173.) On the
same day, FEMA extended the deadline for filing a Proof of Loss
to two years following the date of loss until October 29, 2014.
(Def. SMF at ¶ 107.) On June 26, 2014, Plaintiff filed an
appeal with FEMA claiming that the cost to rebuild his home
exceeds the policy limits of $250,000. (Id. at ¶ 108.)
Plaintiff included the POL documents along with Careaga's

Report, bank statements, Carey Certification, and photographic documentation of the structural damage. (Pl. CUMF at ¶ 137.) On August 28, 2015, Plaintiff submitted a claim for Increased Cost of Compliance ("ICC") to Defendant, including a signed and sworn Proof of Loss with all required documents, including permits, receipts and photographs. (Id. at ¶ 209.) Defendant did not deny the ICC claim. (Id. at ¶ 210.)

On December 23, 2015, Plaintiff submitted an amended proof of loss for $129,292.37 (in an attempt to reach a settlement), reducing his claim for the amount he received ($74,525.00) from the New Jersey Department of Community Affairs, Sandy Recovery Division ("DCA"), his $1,000 deductible, and the amounts already received from Defendant ($25,238.88). (Def. SMF at ¶ 134.) Plaintiff stated that he made this offer "on a settlement basis only . . ." (Pl. CSMF at ¶ 178.) On December 24, 2015, Defendant rejected Plaintiff's amended POL and settlement offer as untimely and beyond FEMA's deadline to submit a POL. (Def. SMF at ¶ 135.) Defendant never obtained a waiver from FEMA for Plaintiff's POL. (Id. at ¶ 136.) On February 11, 2016, Plaintiff submitted another amended POL for $84,179.99 with a detailed estimate from Asset Protection for the full cost of repair of Plaintiff's home. (Id. at ¶ 137.) Defendant has not paid Plaintiff more than the $15,212.99 on January 2, 2013 and the $10,025.89 on December 10, 2013. (Pl. SMF at ¶ 166.)

### B. Procedural History

Plaintiff initially filed his Complaint against Defendant alleging breach of contract (Count I), bad faith (Count II), and declaratory relief (Count III) related to Defendant's adjustment of Plaintiff's Superstorm Sandy claim. [Docket Item 1.] The Court granted Defendant's motion for judgment on the pleadings, dismissing Plaintiff's extra-contractual and state tort-based claims (thereby striking Count II of the Complaint), and denied Plaintiff's motion to amend the Complaint. [Docket Item 79.} After discovery, Defendant has filed its extensive and highly detailed motion for summary judgment on Plaintiff's breach of contract claim [Docket Item 85], and Plaintiff cross-moved for partial summary judgment on his ICC claim [Docket Item 94].[6]

## III. STANDARD OF REVIEW

### A. Summary Judgment Standard

Summary judgment is appropriate if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Alabama v. North Carolina, 560 U.S. 330, 344 (2010) (citations and internal quotation marks omitted); see also FED. R. CIV. P. 56(a).

In evaluating Defendant's motion for summary judgment, the Court must view the material facts in the light most favorable to the non-moving party, and make every reasonable inference in

that party's favor.  See Scott v. Harris, 550 U.S. 372, 378
(2007); Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d Cir. 2014).
An inference based upon "'speculation or conjecture,'" however,
"'does not create a material factual dispute sufficient to
defeat summary judgment.'"  Halsey, 750 F.3d at 287 (citations
omitted).  Rather, the non-moving party must support each
essential element with concrete record evidence.  See Celotex
Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

"Where the record taken as a whole could not lead a
rational trier of fact to find for the non-moving party," the
Court may grant summary judgment.  Matsushita Elec. Indus. Co.,
Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

**B. Law Governing the Standard Flood Insurance Policy**

Plaintiff holds a SFIP issued by Defendant, a Write-Your-
Own ("WYO") flood insurance carrier pursuant to the National
Flood Insurance Program ("NFIP").  As the Third Circuit has
explained, the NFIP is "a federally supervised and guaranteed
insurance program presently administered by the Federal
Emergency Management Agency ("FEMA") pursuant to the [National
Flood Insurance Act] and its corresponding regulations." Van
Holt v. Liberty Mut. Fire Ins. Co., 163 F.3d 161, 165 (3d Cir.
1998) (citing 44 C.F.R. §§ 59.1-77.2).  FEMA promulgated the
NFIP, set forth in 44 C.F.R. Pt. 61, App. A(1), (2), and (3),
and provided for claims adjustment of the SFIP by private

insurers operating as WYO companies. <u>Messa v. Omaha Property &</u> <u>Cas. Ins. Co.</u>, 122 F. Supp. 2d 513, 519 (D.N.J. 2000).

"It is well settled that federal common law governs the interpretation of the SFIP at issue here." <u>Torre v. Liberty Mut.</u> <u>Fire Ins. Co.</u>, 781 F.3d 651, 653 (3d Cir. 2015). As with other insurance policies issued under federal programs, the terms and conditions of the SFIP must be strictly construed. <u>Suopys v.</u> <u>Omaha Property & Cas.</u>, 404 F.3d 805, 809 (3d Cir. 2005)("We join a number of other Courts of Appeals in holding that strict adherence to SFIP proof of loss provisions, including the 60-day period for providing proof of loss, is a prerequisite to recovery under the SFIP."; <u>Kennedy v. CAN Ins. Co.</u>, 969 F. Supp. 931, 934 (D.N.J. 1997), <u>aff'd</u>, 156 F.3d 1225 (3d Cir. 1998). Under the SFIP, an insured may not file suit for coverage unless it has complied with all requirements of the policy. <u>See</u> 44 C.F.R. Pt. 61, App. A(1), Art. VII(R) (2003). Where there is disagreement about the amount of flood damages or coverage, the SFIP allows policyholders to appeal to FEMA from any denial of their claims or to contest it in federal court. <u>See</u> 44 C.F.R. § 62.20; <u>id.</u> pt. 61, app. A(1), art. VII(R). However, to invoke either procedure for review of the denial of a flood insurance claim, a policyholder must have first filed a timely and compliant proof of loss. <u>See</u> 44 C.F.R. § 62.20; <u>id.</u> pt. 61, app. A(1), art. VII(R). "Because any claim paid by a WYO Company is a

direct charge to the United States Treasury, strict adherence to the conditions precedent to payment is required." Suopys, 404 F.3d at 809.

## IV. DISCUSSION

### A. Defendant's Motion for Summary Judgment

Defendant argues that the Court should dismiss Plaintiff's Complaint as a matter of law for three reasons: (1) Plaintiff failure to adhere to several mandatory SFIP provisions, (2) Plaintiff's failure to make repairs to his house prior to Superstorm Sandy prevents him from recovering damages beyond direct physical loss by or from flood, and (3) Plaintiff's SFIP policy should be void as a matter of law based on Plaintiff's alleged material misrepresentations through the adjustment process. The Court addresses each argument in turn.

### 1. Failure to Meet Policy Conditions (Proof of Loss)

Defendant first argues that Plaintiff failed to comply with several mandatory SFIP policy provisions that are conditions precedent to recovery and/or seeking relief through litigation. See 44 C.F.R. Pt. 61, App. A(1), Art. VII(R)("You may not sue us to recover money under this policy unless you have complied with all the requirements of the policy."). Article VII(J) of the SFIP provides that:

J. Requirements in Case of Loss

In case of a flood loss to insured property, you must:
1. Give prompt written notice to us;

19

2. As soon as reasonably possible, **separate the damaged and undamaged property, putting it in the best possible order so that we may examine it;**
3. **Prepare an inventory of damaged property showing the quantity, description, actual cash value, and amount of loss.** Attach all bills, receipts, and related documents;
4. **Within 60 days after the loss, send us a proof of loss**, which is your statement of the amount you are claiming under the policy signed and sworn to by you, and which furnishes us with the following information:
   a. The date and time of loss;
   b. A brief explanation of how the loss happened;
   c. Your interest (for example, "owner") and the interest, if any, of others in the damaged property;
   d. Details of any other insurance that may cover the loss;
   e. Changes in title or occupancy of the covered property during the term of the policy;
   f. **Specifications of damaged buildings and detailed repair estimates;**
   g. Names of mortgagees or anyone else having a lien, charge, or claim against the insured property;
   h. Details about who occupied any insured building at the time of loss and for what purpose; and
   i. The inventory of damaged personal property described in J.3. above.

44 C.F.R. Pt. 61, App. (A)(1), Art. 9(J) (2000) / Art. VII(J) (2003)(emphasis added)

### a. (J)(2) and J(3)

First, Defendant argues that Plaintiff failed to "separate the damaged and undamaged property, putting it in the best possible order so that we can examine it," as required by Article VII(J)(2) (Def. Br. at 28-29.) Plaintiff responds that (J)(2) does not apply to him because Plaintiff had no contents coverage and was not making a claim for damaged personalty, and either way, there is photographic evidence that Plaintiff did separate the damaged personalty. (Opp'n at 21.) While Plaintiff

points to no provision in the NFIP regulations nor any caselaw suggesting that (J)(2) applies only to claims of contents coverage, it would be nonsensical for Plaintiff to be required to physically separate damaged "building property" like dishwashers, refrigerators, and other fixtures from undamaged property (see SFIP Art. III(A)(7)).[7]  While the requirements for proof of loss do not state that they are limited to contents coverage only, Plaintiff's contention that he only had buildings coverage (see Ex. 3 to Rosenthal Cert.) demonstrates that complying with Article VII(J)(2) would not be possible.

Moreover, the photographic evidence that Plaintiff submits, depicting several boxes that Plaintiff placed outside of his home shortly after Sandy supports the notion that Plaintiff complied with (J)(2)(see, e.g., Castner Ex. 12; Rosenthal Ex. 7). As a result, a reasonable fact finder could find that Plaintiff complied with (J)(2).  But this dispute is immaterial because there is no evidence Plaintiff complied with (J)(3), now discussed.

There is no evidence in the record that Plaintiff "prepare[d] an inventory of damaged property showing the quantity, description, actual cash value, and amount of loss"

_____

[7] The SFIP is clear as to what items are considered "building property" under Coverage A and what items are considered "personal property" under Coverage B of the policy. SFIP Art. III(A) & B.

under (J)(3).  Plaintiff is not absolved of this requirement simply because he did not have contents coverage, as the "onus remains on the insured to provide proof of loss." See Uddoh v. Selective Ins. Co. of America, No. 12-419, 2014 WL 7404540, at *5 (D.N.J. Dec. 29, 2014)(citations omitted).  Plaintiff must provide sufficient documentation, including an inventory of damaged property, so that the insurer "can evaluate the merits of Plaintiff's claim, including the estimated cost of repair." See Sun Ray Village Owners Ass'n v. Old Dominion Ins. Co., 546 F. Supp. 2d 1283, 1292 (N.D. Fla. 2008).[8]  Strictly construing (J)(3), as this court must under Suopys, Plaintiff does not demonstrate compliance with Article VII(J)(3) of the SFIP. Therefore, because Plaintiff has failed to demonstrate that he submitted a proof of loss complying with all SFIP requirements, no genuine dispute of material fact exists as to whether Plaintiff can recover building property damages.  Accordingly, Defendant is entitled to summary judgment.

---

[8] Plaintiff additionally argues that on November 8, 2012, Defendant's adjuster instructed Plaintiff to "mitigate damages as needed," which Plaintiff "interpreted to mean he should gut the house" instead of separating damaged and undamaged property or preparing an inventory. (Opp'n at 21.)  To the extent this can be construed as an estoppel argument, the Court rejects it, because "[w]hile we apply standard insurance principles to construe the [Standard Flood Insurance Policy], general principles of . . . estoppel do not apply when the insurer is an agent of the United States." Suopys, 404 F.3d at 809.

## b. (J)(4)

While the Court grants summary judgment to Defendant based on Plaintiff's failure to meet Article VII(J)(3), the Court will also address Defendant's remaining arguments for summary judgment. Defendant argues that Plaintiff failed to submit a proper POL for his claim with supporting documentation prior to FEMA's proof of loss deadline and the start of this litigation, as required by Article VII(J)(4). (Def. Br. at 29.) Specifically, it argues Plaintiff did not submit a detailed repair estimate to support his claim until well after the filing of this suit and over a year after the FEMA deadline for submitting a proof of loss had expired, but Plaintiff states that he submitted <u>rebuild</u> estimates in a timely fashion.  It is undisputed that FEMA extended the deadline for filing a POL to two years following the date of loss (here, October 29, 2014), and it is undisputed that Plaintiff submitted a signed POL for the undisputed amount of $20,271.74 on November 23, 2013 (Pl. CSMF. at ¶ 132.) Finally, on April 13, 2014, Plaintiff submitted an amended POL seeking a supplemental payment of $222,191.29 (Ex. 38 to Def. Br.)

Defendant replies that Plaintiff's timely-filed POLs are insufficient under (J)(4)(f) because they lack any information (1) describing what building components were purportedly damaged by Superstorm Sandy, including the quality, conditions, and/or

specifications of the insured property (2) estimating costs for repairing or (3) replacing damaged components, or even describing the insured property in its most basic terms. (Reply Br. at 1-2, 4.)

Plaintiff responds that he submitted two timely signed, sworn, and notarized POLs – on November 23, 2013 and April 14, 2014, along with a host of other supporting documents, including a November 15, 2013 "substantial damage" letter from Lacey Township, various contractor estimates, and engineering reports regarding the nature, scope and cause of damages prior to the POL deadline.[9] (Opp'n at 12, 16, 20.) However, none of these attached documents can be construed to include a "specification of damaged buildings" or "detailed repair estimates" under (J)(4)(f). The November 15, 2013 substantial damage letter states that Plaintiff's home "will either have to be raised to the new advisory flood elevations or demolished and a new home built to new elevations," but does not specify what building components sustained damage, nor is it a detailed repair estimate. (Ex. 38 to Def. Br.)  The five contractor estimates also attached to Plaintiff's April 14, 2014 POL, as Plaintiff admits, were "established to rebuild" his home, not detailed repair estimates. (Opp'n at 20.)  Additionally, the April 9,

_____

[9] Plaintiff submitted a March 6, 2014 POL, but Plaintiff concedes that this was unsigned and therefore non-compliant with the SFIP. (Opp'n at 10.)

2013 Careaga Engineering report, while timely, cannot be considered a "detailed repair estimate" under Article VII(J)(4)(f). While the Careaga report does specify damaged building components, recommending "the entire rear exterior wall, interior load bearing wall, interior support wall below the storage space, and roof be completely restricted," it does not provide a detailed repair estimate. (Ex. 25 to Def. Br.) Moreover, the report states that it "should not be construed as a comprehensive repair report." (Id.)  Strictly construing the POL requirement under (J)(4)(f), Plaintiff has failed to satisfy the SFIP.

The Court finds <u>Uddoh v. Selective Ins. Co. of Am.</u>, No. 12-419, 2014 WL 7404540 (D.N.J. Dec. 29, 2014) instructive. There, Plaintiff held a SFIP including building and contents coverage, and submitted a letter with his timely POL requesting $20,000 in structural damage and $6,250 in construction repairs. <u>Id.</u> at *1. The Court granted summary judgment for the defendant insurer because "Plaintiff did not submit any estimates or reports documenting structural damage in the amount of $20,000.00, thus making it impossible for Defendant to evaluate his claim," and the $6,250 repair estimate did not comply with Article VII(J) because it was "completely devoid of any details as to how the damage occurred, whether the damage was caused by the flood . . .and how much of the $6,250.00 was attributed to each repair."

Id. at *6.  Furthermore, Plaintiff's engineer's report, like

Careaga's here, did not "include a detailed repair estimate

pursuant to Article VII(J)." Id. Similarly, here, Plaintiff

cannot demonstrate under Article VII(J)(4)(f) what the specific

"specifications of [the] damaged buildings" and "detailed repair

estimates" were. Plaintiff distinguishes Uddoh because there,

the plaintiff failed to submit any estimates or reports

documenting the structural damage, and submitted only one

contractor estimate for repair to a patio, which is not a

covered loss under the SFIP. (Opp'n at 20.) But Plaintiff in the

instant case does not submit any detailed repair estimates, only

estimates to rebuild the entire house. Estimates to rebuild an

insured property are not equivalent to an estimate for repairs

under the SFIP. See Monistere v. State Farm Fire and Cas. Co.,

559 F.3d 390, 396 (5th Cir. 2009)(explaining that an estimate to

rebuild "could not have satisfied the documentation requirement

[under (J)(4)(f)], as it is not an estimate of repairs, [and]

was issued in order to determine the demolition cost of the old

home and the proposed price of building a new one.").

    Additionally, Plaintiff relies on Young v. Imperial Fire &

Casualty Ins. Co., No. 13-5246, 2014 WL 1456408, at *2-3 (E.D.

La. Apr. 15, 2014) for the proposition that a combination of

pre-deadline submissions and public adjuster reports can be

adequate under (J)(4).  In Young, it was undisputed that

plaintiffs submitted three signed, sworn POLs for building damage, but the insurer argued that the submissions were inadequate because the detailed public adjuster estimate was not submitted with a signed POL form, and the estimate was not separately signed and sworn by plaintiffs. Id. at *3. The court denied the insurer's motion for summary judgment on inadequate POL grounds because "[a]ll of plaintiffs' Proof of Loss forms, taken together with [the public adjuster's] estimate . . ., constitute a complete Proof of Loss that complies with the SFIP." Id. Additionally, the Court found that the POL forms and the adjuster report "clearly state that the plaintiffs' cost of repair is the amount estimated by [the adjuster's] detailed report . . . "and that plaintiffs claim their policy limit on building coverage, minus the deductible." Id. However, as Defendant correctly points out, Young is distinguishable because the adjuster report "listed each portion of the house separately, and detailed the work that was needed, the square footage, and the removal and replacement costs." Id. at *1. That level of specificity in repairs is absent from Plaintiff's timely POLs.

The Court notes that Plaintiff eventually submitted a proper POL, with a detailed repair estimate, on February 11, 2016. (Ex. 49 to Def. Br.)  But since "strict adherence to SFIP proof of loss provisions . . . is a prerequisite to recovery

under the SFIP," the Court cannot consider Plaintiff's untimely February 2016 Amended POL. <u>Suopys</u>, 404 F.3d at 810; <u>see also</u> <u>Rossetti v. Selective Ins. Co. of Am.</u>, No. 15-5737, 2017 WL 379428, at *3 (D.N.J. Jan. 25, 2017)(emphasizing that "courts do not have the discretion to rewrite the SFIP's filing requirements")(quoting <u>Barmil v. Standard Fire Ins. Co.</u>, No. 11-2377, 2011 WL 4920945, at *2 (D.N.J. Nov. 28, 2011)). The extended deadline to submit Sandy POLs was October 29, 2014, and Plaintiff received no waiver from FEMA. Additionally, this Amended POL was unsigned and not sworn to by Plaintiff.

Plaintiff argues that under <u>Stogner v. Allstate Ins. Co.</u>, No. 09-3037, 2010 WL 148291 (E.D. La. Jan 11, 2010), "it is entirely permissible to supplement or amend a timely POL with estimates supplied after the deadline, provided the new estimate does not seek greater damages than originally sought." (Opp'n at 18.) The court there explained that "it is clear that supplementary proofs of loss are required when a claimant requests more in the supplementary claim than in the original claim," but "if the same amount is claimed, and only the decision is disputed, additional proofs of loss may not be necessary." <u>Stogner</u>, 2010 WL 148291, at *4. Here, Plaintiff's February 2016 Amended POL claim ($85,179.99) was substantially <u>lower</u> than the timely April 2014 POL claim ($250,000). Contrary to Plaintiff's argument, then, given that Plaintiff is asking

for an entirely different amount in his amended POL after initially requesting the policy limit, it was not "entirely permissible" for him to supplement his POL in an untimely fashion. See Slater v. Hartford Ins. Co., 26 F. Supp. 3d 1239, 1252 (M.D. Fla. 2014) (explaining that "a supplemental proof of loss submitted out of time, may be considered with a timely proof of loss, if the supplemental submission makes a claim that is identical to that submitted in the timely proof of loss").

As a result, the Court grants Defendant's motion for summary judgment because Plaintiff failed to comply with Article VII(J)(4) of the SFIP.

### 2. Pre-Existing Conditions Not Caused By Flood

Because the Court grants Defendant's motion for summary judgment for failing to meet the policy conditions under the SFIP, it need not reach Defendant's alternative arguments that Plaintiff cannot recover for any damages beyond any direct physical loss by or from flood or that Plaintiff made material misrepresentations voiding the policy. However, given that both of these arguments are relevant to Plaintiff's cross-motion for partial summary judgment on his Increased Cost of Compliance claim, see infra Part IV.D., the Court will address Defendant's additional arguments for summary judgment.

Defendant argues that the existence of significant pre-existing conditions to Plaintiff's home that he was well aware

of and did not repair precludes him from seeking the full policy limit of $250,000. (Def. Br. at 32.) Specifically, Defendant claims that Plaintiff was aware that his right wall was displaced and not attached to the concrete slab, yet did nothing about it before Sandy.

The plain language of the SFIP insures "against direct physical loss by or from flood" to, inter alia, a policyholder's dwelling. 44 C.F.R. Pt. 61, App. A(1), Art. III-A. The SFIP specifically excludes from coverage "any other economic loss you suffer" on account of flood damage. Id. Art. V-A(7). The SFIP also states that "[w]e are not liable for loss that occurs while there is a hazard that is increased by any means within your control or knowledge." Id. Art. VII. Defendant offers evidence that its engineer, Atlantic, concluded in July 2013 that Plaintiff's home "was in major need of repair well before [Sandy] and the additional damages are strictly the result of failure to perform repairs. (Ex. 28 to Def. Br.)

Plaintiff offers a host of evidence indicating that he made repairs to the wall before Sandy, including (1) over $6,000 in purchases from Home Depot, Sears, and Lowe's from 2010-2012 (Ex. 19 to Opp'n), (2) an interview with Plaintiff's neighbor, Chris Haier, explaining that he saw Plaintiff removing sheetrock to the front of his house after Sandy (Ex. 12 to Def. Br), (3) photographs from December 2012 showing "sheet rock debris" on

Plaintiff's front lawn (Castner Ex. 7), (4) Plaintiff's statement directly after Sandy indicating that he "gutted" his house "to prevent further damage from happening," (5) Plaintiff's deposition testimony indicating the repairs he made after the 2010 fire and Hurricane Irene (McDowell Dep. 74:10 – 102:6), (6) 2010 and 2012 floor plans indicating a substantial reconfiguring of Plaintiff's home (McDowell Cert. Exs. B–D) and (7) a sworn certification from a Michael Carey, who stated that he assisted Plaintiff after August 2011 with hanging drywall in the living room and master bedroom of his home (Ex. 20 to Def. Br.).[10]

Plaintiff has also submitted the 2013 Careaga Engineering Report, which opined that the Sandy damage was caused "100% by the hygrostatic forces of floodwaters during Hurricane Sandy." (Ex. 26 to Def. Br.) Furthermore, Plaintiff's litigation expert, Scott Heyer opined that even if Plaintiff had reanchored, as recommended by the 2011 Atlantic Report, it still "would have

---

[10] Plaintiff argues that the Defendant's Special Investigative Unit (SIU) files calling into question Plaintiff's repairs are not competent evidence because they are inadmissible hearsay, not certified, replete with statements from unidentified sources, and refer to photographs that are not identified. (Ex. 17 to Def. Br.)    The Court finds that the SIU files would be admissible under the business records exception of Fed. R. Evid. 803(6), as the files are supported by a certification from Osmond McMahon, the custodian of records at Defendant's special investigations vendor. (Ex. 58 to Reply Br.)

been insufficient to prevent the damage caused by the floodwaters." (Ex. 17 to Opp'n.)

As a result, given the sharply contested issues regarding Plaintiff's pre-Sandy repairs, the Court would deny summary judgment on this ground.

### 3. Plaintiff's Alleged Material Misrepresentations

Defendant next argues Plaintiff's policy should rendered "null and void" because Plaintiff alleged made a number of material misrepresentations through the adjusting process, including that Plaintiff submitted a "falsely inflated claim" of $250,000, and that Plaintiff's April 13, 2014 POL does not include a deduction for the amount of money he already received, namely $75,000 from the NJ DCA and $25,000 from Defendant; thus, this is an improper "double recovery." (Def. Br. at 36-37.) Additionally, Defendant argues that Plaintiff's SFIP should be void because of several misrepresentations regarding his friend Mr. Bradley's help with electrical repairs, as well as that Plaintiff removed all of the sheet rock from the floor to the ceiling following Hurricane Irene. (Def. Br at 39.) Plaintiff responds that he made no material misrepresentations whatsoever (disputing every fact regarding any alleged material misrepresentations, see Pl. CMSF at §§ 57-59, 61-74, 112-17, 121) and that Defendant distorted Plaintiff's statements in an

effort to create inconsistencies that do not exist. (Opp'n at 47.)[11]

Article VII(B)(1) of the SFIP provides that:

1. With respect to all insureds under this policy, this policy:
   a. Is void;
   b. Has no legal force or effect;
   c. Cannot be renewed; and
   d. Cannot be replaced by a new NFIP policy, if, before or after a loss, you or any other insured or your agent have at any time:
      i. Intentionally concealed or misrepresented any material fact or circumstance;
      ii. Engaged in fraudulent conduct; or
      iii. Made false statements; relating to this policy or any other NFIP insurance.

---

[11] At the outset, the Court rejects Plaintiff's argument that because Defendant did not specifically plead intentional concealment or misrepresentation in its answer, Defendant should be barred from attempting to deny coverage on the basis of a defense as to which it gave Plaintiff no notice. (Opp'n at 46-47.)  First, "[a]lthough is it true that parties should generally assert affirmative defenses early in the litigation, there is no firm rule," so affirmative defenses "may be raised at any time, even after trial, so long as the plaintiff suffers no prejudice." Sharp v. Johnson, 669 F.3d 144, 158 (3d Cir. 2012). Second, Defendant did assert in its Answer that the SFIP's policy provisions cited therein, "or other that may later be found to be applicable, specifically operate to exclude the damages claimed by the Plaintiff in his Coverage from coverage under the policy." [Docket Item 8.]  Article VII(B)(1) of the SFIP specifically includes provisions on fraud, and "no provision [of the SFIP] shall be altered, varied, or waived other than by the express written consent of the Federal Insurance Administrator through the issuance of an appropriate amendatory endorsement . . ." 44 C.F.R. § 61.13(d)(2006). Thus, the provisions of the SFIP applied to Plaintiff whether or not Defendant pled fraud in its Answer.  Third, in a November 17, 2012 letter, Defendant's adjuster Mr. Carlson specifically instructed Plaintiff to refer to SFIP's fraud provisions after finding that Plaintiff's home "did not have repairs from a previous loss completed at the time your home flooded on [October 29, 2012.] (Castner Cert. at Ex. 54.)

44 C.F.R. Pt. 61, App. A(2), Art. VII(B)(1)(2003).

Defendant claims that Plaintiff "knew that the Insured Property was not valued at $250,000," and "clearly knew" that he was making a request for a double recovery in his April 2014 POL when did not deduct the $75,000 from NJ DCA and $25,000 from FEMA that he already received, but Defendant provides no support from the record for these allegations. (Def. Br. at 36-37.) However, Plaintiff states that he "truly believed" that $250,000 was the value of his home, as he was "induced to believe that his home was worth at least $250,000 and was induced to procure coverage in that amount" based on a renewal notice prepared by Defendant and sent to Plaintiff on March 7, 2012. (McDowell Cert. ¶ 28.) Additionally, prior to Plaintiff filing the instant lawsuit, Defendant never supplied Plaintiff with its report valuing his home at $90,480.42. (Id.) Finally, while Defendant claims that Plaintiff's April 13, 2014 POL "does not include a deduction for the amount of money he already received," this is incorrect, as under the category "Less Previous Payment," Plaintiff specifically states "$25,238.88 (Ex. 38 to Def. Br.) The $74,525 DCA figure that Defendant contests was not advanced until July 5, 2014, several months after Plaintiff submitted his April 13, 2014 POL. (Ex. 16 to Def. Br.) As a result, there is a genuine dispute of material fact as to whether Plaintiff falsely inflated his claim and

whether he failed to deduct certain payments he had already
received.

Finally, Defendant claims that Plaintiff misstated that (1)
his friend Bradley helped him perform electrical repairs
following Hurricane Irene, when in fact he later stated that any
repairs Bradley made to the home were prior to Plaintiff's 2010
fire, and (2) that he removed all of the sheet rock from the
floor to the ceiling following Hurricane Irene with the help
from his friend Mr. Carey, but Mr. Carey later stated that only
the bottom few feet of the wall required sheet rock. (Def. Br.
at 38-39.) Defendant argues that these statements were material
because they were "made in attempt to bolster [Plaintiff's]
claim that significant repairs were made to the home following
Hurricane Irene and prior to Sandy," and concern "whether there
were witnesses to substantiate the repairs." (Id. at 39.)
Plaintiff responds that the examiner failed to establish the
time period of Plaintiff's statement regarding Bradley's repairs
(so it was unclear whether the Bradley helped during the 2010
fire or after Hurricane Irene), and mischaracterizes Plaintiff's
statement regarding Carey, as he actually stated that Carey
"[h]elped me put up some of the drywall," not all of it, as
Defendant states. (Pl. CSMF at ¶ 39.) After a thorough review of
the record, the Court finds that there would be factual issues
precluding summary judgment, as it appears that Plaintiff did

not innocently or intentionally deceived Defendant with his statements during adjustment.

Defendant relies on two cases to support its argument that Plaintiff made material misrepresentations that should void his policy: Supermercados Econo v. Integrant Assur. Co., 359 F. Supp. 2d 62 (D.P.R. 2005) and Charnock v. Fidelity Nat'l Prop, No. 10-7015, 2014 WL 2186633 (S.D. Tex. Jan. 7, 2014). In Supermercados, the court found that the insured's SFIP policy was null and void due to material misrepresentation because it "failed to disclose changes in ownership" on its proof of loss. Supermercados, 359 F. Supp. 2d at 68.[12] The court reasoned that the insured's "experience and level of business sophistication is a demonstration of his ability to be aware of and comply with the unambiguous provisions of the SFIP," as the insured "was involved in his trade since 1962." Id.

In Charnock, the insured initially filed a POL after Hurricane Ike for $117,360.76, and the insurer paid the insured $66.837.67. Charnock, 2014 WL 2186633, at *1. Then, "[u]nhappy with [the insurer's] payments, the insured signed another POL "claiming a net amount of $258,500.00, the policy limits." Id. The new POL included a "detailed Floor Repair Estimate" that set the insured's damages at $90.750.00. Id. The Court dismissed

---

[12] Specifically, the POL read "no other person or persons had any interest therein or encumbrances thereon, except (answer space)," and the insured wrote "none." Id.

Plaintiff's complaint because it found that that the insured submitted "under oath . . . a known falsely inflated claim," as "he knew it was excessive at the time he signed it." Id. at *2. The Court explained that "[t]he submission seems even more egregious" because the original POL "was much more accurate than" the $258,500.00 submission." Id.

Supermercados is distinguishable from the case at bar because the court there emphasized not only the insured's high level of business sophistication and ability to answer the POL questions, but that the insured answered an "affirmative 'none' when asked a direct question [in the POL] about past occurrences." 359 F. Supp. 2d at 70. Here, Plaintiff made no such affirmative misstatement on this POL, as Plaintiff supported his $250,000 claim with a wide range of contractor estimates and engineer reports. Charnock is distinguishable because here, there is no indication that Plaintiff knew his claim was excessive at the time he signed it, as he explicitly states otherwise in his certification, and unlike the insured in Charnock, Plaintiff did not couple his stated claim in the POL with supporting documents suggesting a largely different claim figure.

In reviewing the record, the Court finds that there is a genuine issue of material fact as to whether Plaintiff intentionally concealed or misrepresented a material facts under

the SFIP; as a result, Defendant's motion for summary judgment would be denied on this ground.

## B. Plaintiff's Cross-Motion for Partial Summary Judgment on ICC Claim

Finally, Plaintiff cross-moves for partial summary judgment on his increased cost of compliance ("ICC") claim, arguing that he properly and timely submitted a claim for $30,000 on August 28, 2015, but that Defendant improperly refuses to pay and instead has conditioned that payment on Plaintiff relinquishing his right to recover anything more than the $25,238.88 under Part A of the Policy. (Opp'n at 52.) Defendant argues that the policy should be null and void for reasons stated supra, but if the Court were to determine that there are genuine issues of material fact regarding whether Plaintiff made material misrepresentations or false statements during the adjustment of his claim or on his proof of loss, Plaintiff's cross-motion on his ICC claim should be denied. (Def. Reply Br. at 37 n. 24.)

Under Plaintiff's SFIP Policy, Article III(D)(1), Plaintiff may be paid up to $30,000 "to comply with a State or local floodplain management law or ordinance affecting repair or reconstruction of a structure suffering flood damage. Compliance activities eligible for payment are: elevation, floodproofing, relocation, or demolition (or any combination of these activities of your structure." An insured must meet several eligibility requirements under Article III(D)(3), including that

the structure must have "had flood damage in which the cost to repair equals or exceeds 50 percent of the market value of the structure at the time of the flood." Additionally, under Article III(D)(4)(b), "[w]hen the building is repaired or rebuilt, it must be intended for the same occupancy as the present building unless otherwise required by current floodplain management ordinances or laws." Various exclusions are listed under Article III(D)(5).

Plaintiff states that on August 28, 2015, he submitted a timely ICC claim to Defendant, including a signed and sworn Proof of Loss with all required documents, including permits, receipts, and photographs, and Defendant has not denied the claim. (Pl. CSMF at ¶¶ 209-210.)[13] This includes receipts from Gino Mione and Gravatt Consulting Group exceeding $30,000, but Defendant disputes that the receipts exceed $30,000 and that all of the documentation attached to Plaintiff's ICC claim is relevant under Coverage D, as it argues that the cost to rebuild to code only covers damages by or from flood. (Ex. F. to McDowell Cert; Pl.'s Statement of Facts in Reply at ¶ 164.)[14]

---

[13] It is undisputed that Defendant has not issued a denial letter of the ICC Claim. (Pl. SMF in Reply at ¶ 210.)

[14] Defendant also argues that Plaintiff's August 28, 2015 ICC POL is "inadmissible" because it was provided to Defendant's counsel "pursuant to settlement discussions in this case." (Pl. SMF in Reply at ¶ 209.) There is no indication in the record that this particular POL was offered for settlement purposes, so the Court will accept the August 28, 2015 ICC POL as admissible and timely filed.

Given that the Court has denied Defendant's motion for summary judgment regarding loss by flood and material misrepresentations, and that ICC is part of the SFIP policy, the Court also denies Plaintiff's cross-motion for partial summary judgment on its ICC claim at this time. The Court granted summary judgment on Plaintiff's Coverage A claim for building property, given the deficiencies noted <u>supra</u>, but since the ICC is listed under Coverage D, Plaintiff's ICC claim may proceed.

**V.    CONCLUSION**

The accompanying Order will be entered.

**June 30, 2017**
Date

**s/ Jerome B. Simandle**
JEROME B. SIMANDLE
U.S. District Judge